IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| ROBERT W. BAIRD & CO. INCORPORATED<br><br>    Plaintiff,<br><br>v.<br><br>FEDERAL INSURANCE COMPANY,<br><br>    Defendant. | Case No. 2:25-cv-01614 |

## COMPLAINT

Plaintiff Robert W. Baird & Co. Incorporated ("Baird"), by and through its attorneys, for its Complaint against Defendant Federal Insurance Company ("Chubb"), hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for breach of contract, declaratory relief and bad faith arising out of Chubb's bad faith refusal to honor its obligations to cover losses Baird, a financial institution operating for more than a century, incurred as a result of having been fraudulently induced to transfer funds under a Financial Institution Bond that Chubb sold to Baird to cover losses in precisely these circumstances.

2. Specifically, Baird paid substantial premiums for insurance coverage under a primary Financial Institution Bond—issued by non-party National Union Fire Insurance Company of Pittsburgh, Pa ("AIG")—and an excess Financial Institution Bond that follows form to the primary—issued by Chubb—to expressly cover, amongst other things, Baird's losses resulting

1

from fraudulently induced payments made by Baird in good faith reliance on fraudulent instructions provided by a party with whom Baird had a written agreement for goods or services.

3. In November of 2024, Baird incurred precisely such a loss when, after entering into an agreement with White Lake Township ("White Lake") for the purchase of municipal bonds, it transferred $29,064,335.50 to a bank account purporting to belong to White Lake, based on having received fraudulent wire instructions from someone who had hacked into the email account belonging to the supervisor of White Lake.

4. Baird, working diligently with law enforcement and the banks involved, was able to recover all but $5,153,840.49 of the $29,064,355.50 in funds wired pursuant to the fraudulent instructions. Since it had paid premiums for insurance to cover precisely this type of Loss, Baird turned to AIG and Chubb to honor their obligations under the Financial Institution Bonds and reimburse Baird's Losses up to their respective policy limits.

5. After providing notice and submitting Proofs of Loss with supporting documentation, AIG expressly acknowledged that Baird's loss was covered under the primary Financial Institution Bond's Fraudulently-Induced Payment Coverage insuring agreement and paid Baird its full $2,500,000.00 policy limit under that insuring agreement.

6. Notwithstanding that the issuer of the primary Financial Institution Bond, who drafted the language of the Fraudulently-Induced Payment Coverage insuring agreement, had already determined that Baird had suffered a covered loss resulting from a fraudulent instruction that came from one of its vendors with whom it had an agreement and has paid its limits, Chubb has in bad faith disclaimed coverage entirely and been unwilling to honor its contractual obligations to pay Baird the $2,500,000.00 it is obligated to pay for Baird's loss here.

7. Chubb's proffered explanation for disclaiming its obligations depends on its unreasonable construction of the Fraudulently-Induced Payment Coverage insuring agreement as not providing Baird with any coverage for payments that are fraudulently-induced by bad actors purporting to be a party with whom Baird has written agreements to purchase bonds and provide services in connection with those bonds. Fundamentally, Chubb's position that Baird's written agreement with White Lake to purchase municipal bonds here does not fall within the scope of the Fraudulently-Induced Payment Coverage insuring agreement—and that agreements for any financial instruments are not covered—would render that insuring agreement worthless to Baird, a financial services company that deals in the "goods" of financial instruments. Baird never would have purchased or paid premiums for coverage that had no application to it. AIG understood that and properly met its obligations under the Primary agreement.

8. As a result of Chubb's baseless bad faith refusal to cover Baird's loss, Baird was left with no choice but to bring this action seeking to enforce its contractual rights and be paid for the loss it incurred nearly a year ago.

## **PARTIES**

9. Plaintiff Baird is an international financial services firm incorporated in Wisconsin that is headquartered in Milwaukee County, Wisconsin at 777 E. Wisconsin Ave., Milwaukee, Wisconsin 53202. Since its founding in Milwaukee, Wisconsin more than a century ago, Baird has provided a range of financial services, including private wealth management, trust and asset management, public finance, investment banking, capital markets and private equity. Baird has hundreds of billions of dollars in assets under management and, under its unique employee-ownership structure, employs an array of financial professionals.

10. Upon information and belief, Defendant Chubb is a foreign corporation existing under and by virtue of the laws of the State of Indiana and having its principal place of business in the State of New Jersey. Upon information and belief, Defendant Chubb is authorized by the Wisconsin Commissioner of Insurance to sell or write insurance, including Financial Institution Bonds, in Wisconsin and, at all material times, has conducted and continues to conduct substantial insurance business in Wisconsin, including issuing a Financial Institution Bond to Baird, a Wisconsin corporation. Chubb's Registered Agent for service of process in the State of Wisconsin is CT Corporation System, 301 S. Bedford St., Suite 1, Madison, Wisconsin 53703.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Baird and Chubb, and because the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

12. The damages in this case involve Baird's entitlement to at least $2,500,000.00 in coverage for losses insured under a Financial Institution Bond issued by Chubb which Chubb has refused to pay as well as costs and other relief to which Baird is entitled as a result of Chubb's bad faith conduct. Thus, the amount in controversy far exceeds the jurisdictional threshold.

13. This Court has personal jurisdiction over Chubb due to Chubb's substantial contacts with and regular practice of doing business, including by issuing insurance policies and fiduciary bonds, in the state of Wisconsin. Chubb is subject to personal jurisdiction in this district pursuant to Wis. Stat. § 801.05(1)(d) because it is engaged in substantial and not isolated activities within this state. The exercise of personal jurisdiction over Chubb is consistent with the Due Process Clause of the U.S. Constitution.

14. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district. Baird, the Insured, is a Wisconsin corporation and has its principal place of business in Wisconsin.

## FACTUAL BACKGROUND

A. **The Fiduciary Institution Bonds**[1]

15. Baird, pursuant to 12 U.S.C. § 1828(e) and 12 C.F.R. § 7.2013, as well as good business practices, obtained various forms of insurance coverage to protect Baird, depositors, customers and third-parties from various potential claims and losses. Specifically, Baird's portfolio of insurance included a primary Financial Institution Bond, No. 01-542-47-55 (the "AIG Primary Bond") issued to Baird by AIG with a Bond Period from September 1, 2024 to September 1, 2025 (Exhibit 1) and an excess Financial Institution Bond, No. 82516101 (the "Chubb Excess Bond") issued to Baird by Chubb with a Bond Period from September 1, 2024 to September 1, 2025 (Exhibit 2) (collectively, "the 2024-2025 Bonds").

16. The Chubb Excess Bond follows form to the coverage provided by the AIG Primary Bond, meaning that, unless stated otherwise, it adopts the terms and conditions of the AIG Primary Bond.

17. As relevant here, the AIG Primary Bond contains the following Insuring Agreement:

> The Underwriter, in consideration of an agreed premium, and in reliance upon all statements made and information furnished to the Underwriter by the Insured in applying for this bond, and subject to the Declarations, Insuring Agreements, General Agreements, Conditions and Limitations and other terms hereof, agrees to indemnify the **Insured** for: . . .
>
> FRAUDULENTLY-INDUCED PAYMENT COVERAGE

---

[1] Bolded terms shall have the same meaning as defined in the AIG Primary Fiduciary Institution Bond.

> **Loss** of **Funds** resulting directly from an **Insured** having, in good faith, transferred **Funds** from its own account in reliance upon **Fraudulently-Induced Instruction(s)**.

Ex. 1, Insuring Agreements, Rider 19 for "Impersonation Fraud."

18. The AIG Primary Bond, as amended by Rider 26, defines **Insured** as meaning not only Baird Financial Group, Inc., but also "Robert W. Baird & Co. Incorporated." Ex. 1, Rider 26.

19. The AIG Primary Bond, as amended by Rider 19, defines **"Fraudulently-Induced Instruction"** as meaning:

> [A]ny instruction communicated to an **Insured** for the purpose of directing or transferring **Insured Funds** and/or updating vendor bank account information that were communicated by:
>
> a. a person purporting to be a director, officer, partner, member or sole proprietor of the Insured or other Employee—or by an individual acting in collusion with such person purporting to be a director, officer, partner, member, sole proprietor or other Employee (hereinafter referred to as an "**Internal Requestor**"), or
>
> b. a person purporting to be an employee of a vendor that has a legitimate pre-existing arrangement or written agreement to provide goods or services to the Insured—or by an individual acting in collusion with such person purporting to be a vendor employee (hereinafter referred to as a "**Vendor Requestor**"); provided, however, Fraudulently-Induced Instruction shall not include any such instruction transmitted by an actual vendor employee who was acting in collusion with any third party in submitting such instruction but which instructions were not actually made by a director, officer, partner, member or sole proprietor or other Employee of the Insured or by an employee of a vendor.

Ex. 1, Rider 19.

20. The terms "vendor," "goods" and "services" are not defined terms in the AIG Primary Bond.

21. The AIG Primary Bond, as amended by Rider 19, defines **"Funds"** to mean "Money on deposit in an account with a credit balance."

6

22. As set forth in Rider 19, **Fraudulently-Induced Payment Coverage** has its own separate limits of liability, such that "[t]he maximum the Underwriter shall be liable for all loss under the FRAUDULENTLY-INDUCED PAYMENT COVERAGE Insuring Agreement shall be:"

- $2,500,000.00 for each **Single Loss** sustained where the **Insured** did not subject the **Fraudulently-Induced Instruction** to an **out-of-band authentication procedure** (or other authentication procedure approved in writing by the Underwriter);

- $15,000,000.00 for each **Single Loss** sustained where the **Insured** subjected the **Fraudulently-Induced Instruction** to an **out-of-band authentication procedure** (or other authentication procedure approved in writing by the Underwriter) and a contemporaneous record of such authentication is provided to the underwriter; and

- $15,000,000.00 in the aggregate for all loss under the **FRAUDULENTLY-INDUCED PAYMENT COVERAGE** Insuring Agreement.

Ex. 1, Rider 19, ¶3.

23. "**Out-of-band authentication procedure**" is defined in Rider 19 as meaning:

A procedure for confirming that:

> (i) an instruction from an **Internal Requestor** was actually made by a director, officer, partner, member or sole proprietor or other Employee of the Insured; or
>
> (ii) an instruction from a **Vendor Requestor** was actually made by an employee of a vendor; through use of a communication channel that is separate and unconnected from the communication channel used to send the initial instruction.

Ex. 1, Rider 19, ¶4.

**B. Baird Enters Into an Agreement with White Lake and in Good Faith Transfers Nearly $30 Million in Funds Based on Fraudulent Instructions.**

24. On October 31, 2024, Baird entered into a written agreement with White Lake to purchase bonds offered by White Lake pursuant to a competitive bid process.

25. The total purchase price for the bonds was approximately $29,000,000.00.

26. On November 11, 2024, Baird received an email from Mr. Bendzinski, White Lake's financial advisor on the transaction, that included wire instructions for Baird to complete the transaction for Baird's purchase of bonds from White Lake and directed Baird to wire the funds to White Lake's general fund checking account at JPMorgan Chase Bank.

27. On November 12, 2024, Mr. Mike Roman, White Lake's Treasurer, responded to the November 11, 2024 email referenced above confirming that the wire instructions were correct.

28. On November 13, 2024, both Baird and Mr. Bendzinski received an email purporting to be from White Lake's town Supervisor, Mr. Rik Kowall, indicating that there had been a municipal board meeting for White Lake the morning of that same day, and the wire instructions needed to be revised to reflect that Baird should wire the agreed upon purchase price of $29,064,355.50 to a different bank account at Citibank than that which was identified in Mr. Bendzinski's November 11, 2024 email.

29. That November 13, 2024 email would later turn out to be fraudulent.

30. Acting on the instructions set forth in the November 13, 2024 email purporting to be from White Lake's town Supervisor, Mr. Rik Kowall, Mr. Bendzinski revised the wire instructions to Baird and provided Baird with the new bank account number where Baird should send the funds for the bond purchase.

31. On November 21, 2024, in reliance on the aforementioned instructions, Baird wired $29,064,355.50 to the new bank account number provided.

32. Subsequently, Baird was notified by White Lake's bond counsel that their email system had been hacked. Specifically, through the hack, a bad actor accessed the email account belonging to White Lake's town supervisor, Mr. Rik Kowall, and sent the November 13, 2024

8

instructions providing a new bank account that was not associated with White Lake for Baird to wire the funds for the bond purchase.

33. A review of the aforementioned email from Mr. Rik Kowall, White Lake town supervisor, containing the fraudulent instructions revealed that the recipient email addresses for the White Lake officials had been altered, with the domain name changed from "@whitelaketwp" to "@whltelaketwp," which allowed the fraudulent bad actors to direct the funds Baird wired to their own bank accounts as opposed to those of White Lake.

34. On November 22, 2024, Baird filed a report to the Federal Bureau of Investigation's Internet Crime Complaint Center.

35. Around that same time, Baird also notified its bank, U.S. Bank, and the bank at which the fraudsters had set up an account for the funds intended for White Lake to be wired to, Citibank.

36. With the help of law enforcement, Baird, Citibank and U.S. Bank were able to successfully recover all but $5,153,840.49 of the $29,064,355.50 in funds wired pursuant to the fraudulent instructions.

    **C.    AIG Pays Its Limits for Baird's Loss, Acknowledging Fraudulently-Induced Payment Coverage, but Chubb Refuses to Honor Its Contractual Obligations to Baird.**

37. On December 6, 2024, Baird provided notice of its loss under the 2024-2025 Bonds to both AIG and Chubb.

38. On January 23, 2025, AIG sent a letter to Baird in which it sought further information to determine if the circumstances resulting in Baird's loss were covered under the Fraudulently-Induced Payment Coverage and provided Baird with a Proof of Loss to submit.

39. Prior to receiving the Proof of Loss and supporting documentation providing further details, AIG initially questioned whether coverage was available under the Fraudulently-

Induced Payment insuring agreement solely because it believed that Baird's wire transfer had been made in reliance on "a revised final closing memorandum circulated by the Township's outside financial advisor," and thus not on a fraudulent communication from "a person purporting to be an employee of a vendor." AIG never suggested that White Lake was not a vendor under the Primary Bond or that Baird and White Lake's written agreement was not the type contemplated by the Fraudulently-Induced Payment Coverage insuring agreement.

40. On March 21, 2025 and May 2, 2025, respectively, Baird submitted the completed Proof of Loss as well as supporting attachments to AIG and Chubb.

41. On May 1, 2025, after reviewing the materials Baird submitted, AIG sent a letter to Baird confirming that Baird's loss was covered under the Fraudulently-Induced Payment Coverage insuring grant of the Primary Bond. AIG described the circumstances of the loss as follows:

> Baird transferred $29,064,335.50 to a bank account controlled by a fraudulent actor after receiving an email purporting to be a supervisor of White Lake Township, (the "Township"). Specifically, Baird offered to purchase bonds from the Township, which offer was accepted by the Township. During the course of arranging for the purchase, an individual posing as Rik Kowall (White Lake Township Supervisor) infiltrated an email thread to provide fraudulent account information. In particular, on November 13, 2024, an individual purporting to be Rik Kowall sent an email to four Baird employees and others, providing updated banking information for the transaction. The closing memorandum was updated to include the fraudulent account information, and Baird sent the funds to the fraudulent account.

42. AIG now understood that Baird's transfer was not made in reliance upon a revised final closing memorandum circulated by White Lake's outside financial advisor, and thus explained:

> AIG Claims reviewed the information submitted by Baird and determined that the Claim is covered under the Impersonation Fraud coverage because *Baird transferred funds from its account in reliance upon a Fraudulently-Induced Instruction, purportedly issued by a Vendor Requestor*. We determined that Baird has substantiated a loss in the amount of $5,154,075.88. As noted above, there is a $2,500,000 limit of liability for losses where the Insured did not subject the Fraudulently-Induced Instruction to an out-of-band authentication procedure, and

10

there is no evidence Baird did so here. Accordingly, we will be issuing an indemnity payment to Baird in the amount of $2,500,000.

43. Notwithstanding that, after considering the actual supporting documentation demonstrating the circumstance of Baird's loss, AIG had already expressly determined that Baird's loss was covered under the Fraudulently-Induced Payment Coverage insuring grant of the Primary Bond to which the Chubb Excess Bond follows form, Chubb sent a letter on June 26, 2025 to Baird in which it disclaimed any coverage obligation based on its position that White Lake "did not contract with Baird to provide goods and services," so White Lake was not a "Vendor Requestor" and there was no "Fraudulent Instruction."

44. On July 23, 2025, Baird sent a response to Chubb reiterating that AIG had already expressly concluded that Baird and White Lake had entered into a written agreement as contemplated for White Lake to be a "Vendor Requestor" such that Baird's loss was covered under the Fraudulently-Induced Payment Coverage insuring grant, explaining why substantively AIG's determination was consistent with the language of the Primary Bond and underscoring that Chubb had not articulated any clear justification for its denial of coverage beyond mere conclusions. Moreover, Baird emphasized in its letter to Chubb that neither "goods or services" were defined terms and Baird is a financial services company so "the goods we deal in are financial instruments and the services we provide are financial ones." Specifically, in its letter to Chubb, Baird wrote:

> We write to express our great disappointment with Chubb's initial denial of Baird's claim, which requests coverage under Rider 19 of the Policy, which we note that AIG has already concluded is proper. We strongly encourage you to reconsider your position on this denial of coverage. We find your decision improper…the Policy does not define "good or service," and given that Baird is a financial institution, Chubb has no reasonable argument that the good or service exchanged between White Lake and Baird (i.e. a municipal bond being brought to sale into the financial markets) does not meet said definition…
>
> Fundamentally, Baird is a financial services company. The goods we deal in are financial instruments and the services we provide are financial ones. We do not

11

make widgets. *Baird would never have purchased this Policy if we had any basis to believe that you would conclude that the primary good we deal in, financial instruments, would be uncovered. Your conclusion renders the entire Rider moot, as it appears we would never be able to file a claim under the same.* If Chubb's position is that a financial instrument can never be a good or financial transactions can never be a service under the policy, we demand an explanation as to whether Chubb would ever find coverage for Baird under this Rider.

45. In its July 23 letter to Chubb, Baird articulated clearly why, as AIG had already found, the Fraudulently-Induced Payment coverage applied here:

> Baird purchased an item that another party put up for sale, no different than if White Lake had provided Baird with a chair, vehicle, or any other type of commodity. Considered from another angle, Baird's activity in the market can also be considered a service. In the instant case, the municipality here wanted to issue bonds to raise money. Baird's function in the market is as a service provider to buy such bonds.

46. Baird also formally requested a written explanation "as to why Chubb has concluded that a municipal bond, or any financial instrument, does not qualify as a good or service under the Rider" and emphasized Chubb's unreasonable delay in engaging with Baird in coverage discussions, "[e]ven though Chubb has had proof of loss since May 2, 2025. *Chubb has not, to date, made any meaningful effort to engage Baird in a good faith discussion of the coverage.*" (emphasis added).

47. Nearly two months later, on September 9, 2025, Chubb finally responded to Baird's July 23, 2025 letter. Chubb did not dispute the circumstances of Baird's loss, "an unidentified threat actor sent an email impersonating Rik Kowall (a White Lake Township Supervisor) and provided fraudulent account information." Nonetheless, Chubb continued to insist that it had no coverage obligation whatsoever, stating that it did not matter that AIG had reached the opposite conclusion as to the scope of coverage provided by the Fraudulently-Induced Payment Coverage insuring agreement and that White Lake was not a "Vendor" with whom Baird had a written agreement for "goods or services" as required for coverage under that insuring grant.

12

48. Baird had requested a fulsome explanation of the bases for Chubb's denial under the actual terms of the Primary Bond and, more specifically, that Chubb explain how it would ever find coverage under the Fraudulently-Induced Payment coverage insuring agreement for Baird, as a financial institution who definitionally deals in financial instruments (which Chubb insists fall outside the scope of coverage), but Chubb belatedly sent a paltry 3-and-a-half page response primarily reiterating the same positions it had taken in its June 26 letter. Tellingly, Chubb offered no response to Baird's question as to "whether Chubb would ever find coverage for Baird under this [Fraudulently-Induced Payment Coverage] Rider" given its unreasonable construction of that provision's plain terms.

49. To date, although AIG paid Baird its $2,500,000.00 in limits on the Primary Bond towards Baird's almost $6 million loss and concluded that Baird's loss is covered under the language that AIG drafted, Chubb has not paid a penny towards Baird's loss.

## COUNT I
## DECLARATORY JUDGMENT

50. Baird incorporates by reference the above paragraphs of the Complaint as if fully set forth herein.

51. As detailed above, Baird's loss here falls squarely within the coverage of the 2024-2025 Bonds, and coverage is not otherwise excluded by any terms or conditions therein. Thus, Chubb is obligated to pay Baird for its loss, subject only to the attachment point and limit of liability of the Chubb Excess Bond.

52. Baird has paid all premiums, provided prompt notice of its loss, and otherwise performed all obligations required of it under the 2024-2025 Bonds, or is excused therefrom with respect to the Chubb Excess Bond by Chubb's denial and delay tactics in paying Baird for its clearly covered loss.

53. AIG has paid its limits of $2,500,000.00 under the Primary Bond such that the Chubb Excess Bond's coverage is triggered.

54. Despite repeated demands, Chubb has refused to pay what is owed to Baird under the Chubb Excess Bond for Baird's losses resulting from fraudulent instructions received by Baird from a bad actor purporting to be White Lake's town supervisor. Upon information and belief, Chubb will continue to dispute its obligations to pay for Baird's losses under the Chubb Excess Bond.

55. Baird is entitled to a declaration by this Court of Chubb's obligations under the Chubb Excess Bond regarding coverage for Baird's losses.

56. The facts set forth above demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the 2024-2025 Bonds, and the rights and obligations of the parties thereunder, which claims are ripe for adjudication.

57. The issuance of declaratory relief by this Court will terminate the existing controversy among the parties.

58. Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of Baird and against Chubb, declaring that Chubb is obligated to pay in full Baird's losses.

## COUNT II
## BREACH OF CONTRACT

59. Baird incorporates by reference the above paragraphs of the Complaint as if fully set forth herein.

60. The Chubb Excess Bond constitutes a valid and enforceable contract between Baird and Chubb.

61. Baird's losses trigger the 2024-2025 Bonds' coverage grant.

62. Under the terms of the 2024-2025 Bonds, Baird is entitled to coverage for the fraudulently-induced payment losses that Baird has incurred as a result of the instructions received by Baird from a bad actor purporting to be White Lake's town supervisor.

63. AIG has paid its limits of $2,500,000.00 under the Primary Bond such that the Chubb Excess Bond's coverage is triggered.

64. Chubb has refused repeated demands for payment of what is owed to Baird under the Chubb Excess Bond for Baird's losses.

65. As a result of Chubb's breach of its obligation to pay for Baird's losses under the Chubb Excess Bond, Baird has incurred damages in an amount to be determined at trial, including money damages for compensatory and consequential damages, and the costs and disbursement of this action, including but not limited to attorney's fees and pre- and post-judgment interest.

## COUNT III
## BAD FAITH

66. Baird incorporates by reference the above paragraphs of the Complaint as if fully set forth herein.

67. The acts and omissions of Chubb as set forth above, and some yet to be discovered in this matter, constitute bad faith.

68. Chubb has a duty to act in good faith in the handling and payment of losses incurred by its insured, Baird.

69. Chubb's refusal to pay Baird's loss resulting from fraudulent instructions received by Baird from White Lake, subject only to its attachment point and limits of liability, under the Chubb Excess Bond is not predicated upon any circumstances that furnish reasonable justification in support of Chubb's refusal to pay.

70. Chubb's refusal to pay Baird's loss resulting from fraudulent instructions received by Baird from a bad actor purporting to be White Lake's town supervisor, subject only to its attachment point and limits of liability, under the Chubb Excess Bond is arbitrary and capricious, not supported by any rational or reasonable determination process or basis, and is done solely in its own interests.

71. Chubb's disclaimer of coverage for Baird's loss resulting from fraudulent instructions received by Baird from a bad actor purporting to be White Lake's town supervisor is not based on any reasonable construction of the language of the Primary Bond, to which the Chubb Excess Bond follows form.

72. As stated throughout the Complaint, Chubb has disclaimed coverage on the basis that there was no Fraudulently-Induced Payment because White Lake was not a party with whom Baird had an agreement for the provision of goods or services within the meaning of a Vendor under the 2024-2025 Bonds, even though the drafter of that language has expressly determined that Baird's loss is covered as a Fraudulently-Induced Payment because White Lake and Baird had an agreement for the provision of goods or services within the meaning of a Vendor.

73. As a direct and proximate result of the bad faith exhibited by Chubb, Baird has suffered damages.

74. Chubb's bad faith conduct toward Baird is also egregious, willful, and malicious, entitling Baird to punitive damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Baird prays for relief as follows:

(a) On the First Cause of Action, Baird requests that this Court enter a declaration regarding the scope of Chubb's obligations under the Chubb Excess Bond in connection with Baird's losses;

(b) On the Second Cause of Action, Baird requests that the Court enter judgment against Chubb, awarding Baird money damages against Chubb in an amount to be determined at trial, including consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law, arising from Chubb's breach of the Chubb Excess Bond;

(c) On the Third Cause of Action, Baird requests that this Court enter judgment against Chubb, awarding Baird money damages, separate from, and not limited to the Chubb Excess Bond's limits, against Chubb in an amount to be determined at trial, including direct, compensatory, consequential and/or punitive damages, attorneys' fees, and pre- and postjudgment interest to the extent permitted by law, arising from Chubb's bad faith conduct and breach of its obligation of good faith and fair dealing to Baird;

(d) On all Causes of Action, Baird requests that this Court award Baird all costs incurred because of having to prosecute this lawsuit, including attorneys' fees and pre- and post-judgment interest to the extent permitted by law; and

(e) On all Causes of Action, Baird requests such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Baird demands a trial by jury on all issues, claims, defenses, and counterclaims in this action so triable.

Dated this 20th day of October, 2025.

/s/ *Erin M. Cook*
Erin M. Cook
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
Phone: 414-273-3500
Fax: 414-273-5198
Email: mcook@gklaw.com

Adam Ziffer
Elizabeth Olsen*
COHEN ZIFFER FRENCHMAN & MCKENNA LLP
1325 Avenue of the Americas, 31st Fl.
New York, NY 10019
Tel: (212) 584-1890
Fax: (212) 584-1891
Email: aziffer@cohenziffer.com
Email: bolsen@cohenziffer.com
**Application for admission forthcoming*

*Attorneys for Plaintiff Robert W. Baird & Co. Incorporated*